## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DINO N. THEODORE, on behalf of himself** ) <br> **and all persons similarly situated, and** ) <br> **ACCESS WITH SUCCESS, INC.,** ) <br> **Plaintiffs** ) <br> ) <br> **v.** ) <br> ) <br> **UBER TECHNOLOGIES, INC.,** ) <br> **Defendant** ) | **CIVIL ACTION NO.: 1812147** |

## CLASS ACTION COMPLAINT

DINO N. THEODORE (the "plaintiff" or "Mr. Theodore"), on behalf of himself and all persons similarly situated, and ACCESS WITH SUCCESS, INC., ("AWS") by and through their undersigned counsel, hereby file this Class Action Complaint and sue UBER TECHNOLOGIES, INC., a Delaware corporation, d/b/a UBER (hereinafter, "UBER"), and in support thereof states as follows:

## JURISDICTION AND VENUE

1.      This is an action for injunctive relief pursuant to Title III of the Americans With Disabilities Act, 42 USC §12181, et seq., ("ADA").

2.      The Court has primary jurisdiction over this matter pursuant to 28 USC §1331 and §1343 in that this action arises under the laws of the United States and the defendant is subject to personal jurisdiction.

3.      Venue is proper in this Court under 28 USC §1391, the claim having arisen in the Commonwealth of Massachusetts.

## PARTIES

4.      The plaintiff, Dino N. Theodore, age 58, is paralyzed from the chest down and

uses a wheelchair for ambulation.  He drives a car equipped with hand controls.

5.      Mr. Theodore resides at 1305 Methuen Street, Dracut, Massachusetts.  He is a practicing attorney employed by the Department of Industrial Accidents in Massachusetts.  He has been admitted to practice law in Massachusetts since 1993.

6.      Mr. Theodore is a qualified individual with disabilities within the meaning of all applicable statutes, including the ADA, and is disabled within the meaning of the ADA in that he is substantially limited in performing one or more major life activities, including but not limited to walking and standing.

6.1      Although he usually drives a car equipped with hand controls, Mr. Theodore occasionally requires the use of vehicles-for-hire that are wheelchair accessible and that provide other reasonable accommodations.

6.2      Mr. Theodore has become increasingly dependent on friends and family for rides because he sustained a third degree burn on his left foot in June 2018.

6.3      Over the past two years, the muscles, tendons, and ligaments of Mr. Theodore's shoulders have deteriorated with the wear and tear of using a manual wheelchair for more than 35 years, which makes it more difficult for him to transfer from his wheelchair to the driver's seat of his car.

6.4      The deterioration of his shoulders has caused Mr. Theodore to need to use a power wheelchair more frequently.  Driving a car is not an option for him when he needs to use a power wheelchair.

7.      The plaintiff, AWS, is a non-profit corporation organized and existing under the laws of the Commonwealth of Massachusetts.  Its members are able-bodied individuals and qualified individuals with disabilities as defined by the ADA.

8.      The individually named plaintiff, Dino N. Theodore, is a member and a director of AWS.  All members of AWS are qualified individuals with disabilities within the meaning of the ADA or, if they are not themselves disabled, they are associated closely, by marriage, for example, with someone who is.

9.      AWS is a civil rights group organized for charitable and educational purposes by individuals with disabilities to advocate for the integration into society of disabled persons and equal access to all services, activities, programs, resources and facilities available to non-disabled persons. Its members are predominantly, but not exclusively, individuals with various physical disabilities impairing mobility, speech, vision, and hearing. One of the primary purposes of AWS is to assure that private places of public accommodation are accessible to, and usable by persons with disabilities. AWS seeks to send a clear message that segregated services and inaccessible public accommodations are against the law and should not be tolerated.

10.      Title III of the ADA permits private individuals to bring lawsuits in which they can obtain court orders to stop discrimination on the basis of disability.

11.      AWS and its members have suffered direct and indirect injury as a result of the defendant's actions or inactions as described herein.  AWS also has been discriminated against because of its association with Dino Theodore and his claims. UBER's failure to comply with the ADA adversely affects the organizational purpose of AWS.

12.      UBER is a foreign corporation, organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California. UBER is authorized to conduct and does conduct business in the Commonwealth.  UBER may be served by service on its registered agent for service of process CT Corporation

System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.

13.     UBER is a transportation network company, ("TNC") as defined by G.L. c. 159A½, §1, because it uses a digital network to connect riders to drivers to pre-arrange and provide transportation.

## CLASS ACTION ALLEGATIONS

14.     Mr. Theodore brings this action on his own behalf and, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), on behalf of all similarly situated residents of Massachusetts who are not eligible users of The Ride, who require wheelchair accessible vehicle ("WAV") service, and who desire to use and who would use UBER's transportation network and services but for UBER's failure to provide WAV service.

14.1     **Numerosity**: The proposed class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court.

14.2     **Typicality**: Mr. Theodore's claims are typical of the claims of the members of the proposed class. His claims and the claims of the proposed class are based on the same legal theories and arise from the same nucleus of facts.

14.3     **Common Questions of Fact and Law**: There is a well-defined community of interest and common questions of fact and law affecting members of the proposed class in that they all have been and/or are being denied their civil rights to full and equal access to, and use and enjoyment of UBER's , facilities and/or services due to UBER's failure to make its transportation network and service wheelchair accessible.

14.4     The questions of fact and law common to the proposed class include but are not limited to the following:

a.   Whether UBER's conduct in failing to make its transportation network and service fully accessible and independently usable as above described violated the ADA, 42 U.S.C. §§ 12182 and 12184, 49 CFR Part 37, and G.L. c. 159A½, §3(c)(vi); and

b.   Whether Mr. Theodore, AWS, and members of the proposed class are entitled to injunctive relief, and, if so, whether the plaintiffs' are entitled to an award of attorneys' fees and costs pursuant to 42 USC §12205.

14.5   **Adequacy of Representation**: Mr. Theodore is an adequate representative of the proposed class because his interests do not conflict with the interests of the members of the proposed class.  Mr. Theodore will fairly, adequately, and vigorously represent and protect the interests of the members of the proposed class and has no interests antagonistic to the proposed class. Mr. Theodore has retained counsel who is competent in the prosecution of class action litigation.

14.6   Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because UBER has acted or has refused to act on grounds generally applicable to the proposed class, making appropriate injunctive relief with respect to Mr. Theodore, AWS, and the proposed class as a whole.

## FACTUAL ALLEGATIONS IN SUPPORT OF CLASS CERTIFICATION

15.   Due to the widespread adoption of smart phones, UBER and other TNCs have supplanted traditional taxi companies and have become the public's first choice for on-demand taxi services.

15.1   Mr. Theodore and others similarly situated have been excluded for the most part from this important technological and social change in taxi services.

15.2   In October 2016, UBER (and another TNC) partnered with the Massachusetts Bay Transportation Authority ("MBTA") to introduce an On-Demand Para-Transit Pilot Program that provides subsidized rides in WAVs for disabled passengers who reside

within the service area of the MBTA's para-transit service known as  "The RIDE."

16.     "The on-demand pilot operates in conjunction with traditional RIDE service,

offering reduced fares, lower wait times, faster trips without the need to share rides, and

same-day booking (compared to The RIDE's day prior notice) for RIDE service areas

and hours of operation. The program includes options for wheel-chair accessible vehicles

and includes access for MBTA para-transit customers without smart phones."  *"Governor*

*Baker, MBTA Celebrate Expansion of The RIDE's On-Demand Paratransit Service."*

*(February 28, 2017).*

17.     Outside of the On-Demand Para-Transit Pilot Program with UBER, i.e., in the

ordinary operation of The RIDE, the only way for a disabled passenger to reserve a trip is

to call a customer service telephone number for The Ride Access Center ("TRAC").

17.1    TRAC accepts reservations seven days per week between 8:30 a.m. and 5 p.m.,

including holidays.  Same-day reservations are not, however, accepted under any

circumstances.

18.     An eligible customer must reserve a trip on The RIDE between one and seven

days in advance.

19.     UBER, by contrast, provides passengers with on-demand service through its

website and mobile app.  Passengers can book trips instantly.  For those who prefer or

need to communicate by voice, UBER offers a telephone number for concierge service.

20.     With the introduction of the On-Demand Para-Transit Pilot Program in October

2016, 400 eligible users of The RIDE became able to book same-day trips with WAV

service instantly via UBER's digital platforms.

21.     Under the On-Demand Para-Transit Pilot Program, an eligible customer pays a minimum of $2 per ride and the portion of any fare exceeding $15.  The MBTA subsidizes up to $13 per ride.

22.     Wait-times are shorter under the On-Demand Para-Transit Pilot Program and trips are generally faster.  *"Governor Baker, MBTA Celebrate Expansion of The RIDE's On-Demand Paratransit Service." (February 28, 2017).*

23.     The Commonwealth's goal with regard to the On-Demand Para-Transit Pilot Program was "to improve customer's flexibility and mobility, test the implementation of on-demand options, and assess the financial and operational feasibility of the new model."  *"Final Report of the Commonwealth of Massachusetts Ride for Hire Task Force." (February 5, 2018).*

24.     Effective March 1, 2017, the On-Demand Para-Transit Pilot Program was expanded to include all eligible users of The RIDE.  *"Governor Baker, MBTA Celebrate Expansion of The RIDE's On-Demand Para-Transit Service." (February 28, 2017).*

25.     "The pilot program has been extended to January 1, 2019, but is subject to change or cancellation during this period." *MBTA, "On-Demand Para-Transit Pilot Program."*

26.     The service area of The Ride is shown as the green shaded area of the map in **Figure 1** below:



**Fig. 1 – The RIDE Service Area**

27.     The darker shaded area right of center in **Figure 1** represents Logan Airport, which is not serviced by The RIDE.

28.     Mr. Theodore lives and works outside the service area of The Ride. He is not an eligible user.

29.     UBER offers its customers a variety of ride-sharing services throughout the Commonwealth, including different tiers of service relating to the size or quality of the vehicle.

30.     Under G.L. c. 159A½, §3(c)(vi), every applicant for an annual permit to operate a TNC, such as UBER, must verify to the TNC Division of the Department of Public Utilities that it:

"[h]as an oversight process in place to ensure that the applicant and drivers using the applicant's digital network *accommodate riders with special needs, including riders requiring wheelchair accessible vehicles, in all areas served by transportation network companies, comply with all applicable laws regarding nondiscrimination against riders or potential riders* and ensure the accommodation of riders with special needs including, but not limited to, all applicable laws, rules and regulations relating to the accommodation of service animals." (Italics added).

31.     In all areas of Massachusetts that it serves, UBER is required by law to accommodate riders with special needs, including potential riders such as Mr. Theodore and others similarly situated who require WAV service, but UBER continues not to offer WAV transportation in Massachusetts to anyone except a limited class of eligible users of The RIDE within the Metropolitan Boston service area of The RIDE.

32.     Within the Metropolitan Boston service area of The RIDE, UBER offers WAV transportation only to eligible customers of The RIDE, but does not offer the same to all customers of UBER who require or who potentially require WAV service.

33.     The Lowell Regional Transit Authority ("LRTA") services the town of Dracut where Mr. Theodore resides.

34.     LRTA offers an ADA para-transit service known as "Road Runner," which is available to eligible customers who are unable to ride the LRTA Fixed Route Bus.

35.     UBER has not partnered with LRTA (through Road Runner) or with any regional transit authority other than the MBTA to provide on-demand WAV service to its customers.

36.     While UBER's On-Demand Para-Transit Pilot Program with The RIDE is limited in scope (and is subject to cancellation on or before January 1, 2019), WAV service is, by contrast, *completely unavailable* to current and potential UBER customers who are not eligible customers of The RIDE and who live and work outside The RIDE service area.

36.1    Beyond its participation in the On-Demand Para-Transit Pilot Program, UBER continues to deter and prevent mobility-impaired residents of the Commonwealth who require WAV service from using its transportation network and services.

36.2    The plaintiffs seek to enjoin permanently UBER's systemic violation of the civil rights of mobility-impaired residents of the Commonwealth who require WAV service and other reasonable accommodations, such as assistance with securing a wheelchair to the floor before transportation and releasing it upon arrival.

37.    Mr. Theodore seeks to represent a class that consists of residents of Massachusetts who are not eligible users of The Ride, who require WAV service, and who desire to use and who would use UBER's transportation network and services but for UBER's failure to provide WAV service in violation of G.L. c. 159A½, §3(c)(vi), 42 USC §12184, sections of 49 CFR Part 37 and 42 USC §12182(a).

38.    Due to UBER's failure to provide statewide WAV service, the plaintiffs and others similarly situated are being denied the full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations and programs or activities of UBER, including, but not limited to, different classes and tier options of vehicles that UBER offers to its non-disabled customers.

### SYNOPSIS OF A CAUSE OF ACTION UNDER THE ADA

39.    Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *42 USC § 12101(a)(2)*

40.     Congress found that the many forms such discrimination takes include "outright intentional exclusion" as well as the "failure to make modifications to existing facilities and practices." *42 USC § 12101(a)(5)*

41.     After thoroughly investigating the problem, Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals and to integrate them "into the economic and social mainstream of American life." *S. Rep. No. 101-116, p. 20 (1989); H. R. Rep. No. 101-485, pt. 2, p. 50 (1990).*

42.     The ADA provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *42 USC §12182(a)*

43.     Title III of the ADA prohibits discrimination on the basis of disability by a range of entities, including public accommodations and, as applicable here, private entities primarily engaged in providing transportation services. *42 USC §§12182 and 12184*

43.1    This latter category is covered by §12184 of Title III, which is not contingent upon an entity's status as a public accommodation. The ADA and applicable regulations define coverage under 42 USC §12184 to include most types of transportation provided by private companies.

43.2    Section 12184(a) prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity

that is primarily engaged in the business of transporting people and whose operations affect commerce.

43.3    The term "specified public conveyance" is broadly defined as transportation by any "conveyance (other than aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." *42 USC §12181(10)*

43.4    Congress directed the Secretary of Transportation to issue regulations to implement Title III transportation provisions, including §12184.  Pursuant to this mandate, the United States Department of Transportation ("DOT") promulgated 49 CFR Part 37 and accompanying guidance that explain the Department's construction and interpretation of its implementing regulation. *49 CFR pt. 37, app. D*

43.5    Prohibited discrimination includes discrimination in the provision of taxi services and other transportation services.

43.6    Section 37.29(c) of Title 49, "Private entities providing taxi service," states as follows:

> "Private entities providing taxi service shall not discriminate against individuals with disabilities by actions including, but not limited to, refusing to provide service to individuals with disabilities who can use taxi vehicles, refusing to assist with the stowing of mobility devices, and charging higher fares or fees for carrying individuals with disabilities and their equipment than are charged to other persons."

43.7    Section 37.5(a) of Title 49, "Nondiscrimination," provides as follows:

> "No entity shall discriminate against an individual with a disability in connection with the provision of transportation service."

43.8    Section 37.5(b) of Title 49, provides as follows:

> "Notwithstanding the provision of any special transportation service to individuals with disabilities, an entity shall not, on the basis of disability, deny to

any individual with a disability the opportunity to use the entity's transportation service for the general public, if the individual is capable of using that service."

44.     Section 37.5(f) of Title 49, provides as follows:

"Private entities that are primarily engaged in the business of transporting people and whose operations affect commerce shall not discriminate against any individual on the basis of disability in the full and equal enjoyment of specified transportation services. This obligation includes, with respect to the provision of transportation services, compliance with the requirements of the rules of the Department of Justice concerning eligibility criteria, making reasonable modifications, providing auxiliary aids and services, and removing barriers (28 CFR 36.301–36.306)."

44.1    In order to make a prima facie case under Title III of the ADA, a plaintiff must prove that (1) he has a disability, (2) defendant's facility is a place of public accommodation, (3) and he was denied full and equal treatment because of his disability.

44.2    The ADA's public accommodations provisions also permit an individual to allege discrimination based on a reasonable belief that discrimination is about to occur.

45.     A plaintiff with a disability need not engage in the "futile gesture" of attempting to gain access to each and every feature of a facility where access barriers are known to exist and where the owner or operator does not intend to comply with the provisions of the ADA. *42 USC § 12188(a)(1)*

46.     UBER must be, but is not, in compliance with the ADA, with 42 USC § 12184, with 49 CFR §37, and with G.L. c. 159A½, §3(c)(vi).

46.1    UBER continues to discriminate against the plaintiffs and others similarly situated on the basis of their disability.

46.2    The plaintiffs and other similarly situated persons have suffered harm and will continue to suffer harm as a direct result of UBER's noncompliance with state and federal anti-discrimination laws pertaining to transportation services.

## STATEMENT OF MATERIAL FACTS

47.     On October 4, 2016, Mr. Theodore was planning a trip to Virginia.  He researched the availability of UBER WAV service to and from the Manchester NH Airport.

47.1     He went to UBER's website and created an account.

48.     He then downloaded the UBER app to his smart phone as instructed.

49.     He signed in to the app and entered his pick-up and destination information.  He entered Dracut, MA, to Manchester NH Airport.

50.     The route appeared on a map along with four different vehicle types with prices, UBER black at $103-$137, UBER SUV $119-$155, UBERX at $35-$47, and UBERXL at $67-$89.

51.     Mr. Theodore clicked the question mark icon next to each vehicle to find out more about each one.  None were wheelchair accessible.  There was no information available anywhere in the UBER app on how to request WAV service.

52.      Mr. Theodore went back to UBER's website in an attempt to find useful information on how to request WAV service.

53.     He clicked another prompt that would provide more information on the vehicles offered.  In that field, he was allowed to view vehicles by, economy, premium, accessibility, and carpool.   "Accessibility" was a prompt on a drop down menu, which he clicked and found only a cryptic reference to vehicles that are accessible for wheelchairs or that have special car seats.  The information was not helpful.  It offered no guidance or instructions on how to request a WAV.

54.     Mr. Theodore next went to the "help" prompt and found a page describing UBER's nondiscrimination policy, but nothing on the website identified a way to select or request WAV service.

55.     Mr. Theodore concluded that WAV service was not available through UBER and deleted the UBER app from his smart phone because it was of no use to him.

56.     In early July 2018, Mr. Theodore heard about or read about the availability of WAV service through UBER in Massachusetts.

57.     On July 12, 2018, Mr. Theodore went into UBER's website and read a statement that "uberWAV provides affordable rides in wheelchair-accessible vehicles, where available."  He began the process of signing up, but quickly found out that uberWAV was not available in his area.  He terminated the sign-up.

58.     Mr. Theodore fully intends to use UBER's transportation network in the future if UBER extends its WAV service to the Dracut area.

58.1    UBER has the financial resources to extend its WAV service to the Dracut area and throughout the Commonwealth.

59.     In the first quarter of 2018, UBER's valuation increased to $62 billion.  Revenue jumped 55 percent in the first quarter of 2018 while losses narrowed 49 percent.

*D'Onfro, Jillian and Lipton, Josh, (May 23, 2018) "UBER posts big sales jump in first quarter and boosts valuation to $62 billion."*

60.     UBER is a privately held corporation that plans to go public in 2019.  In an interview with CNBC, UBER CEO, Dara Khosrowshahi, stated, "We are in a good position in terms of the company's profile in terms of profitability.  Margins continue to get better. We have a very strong balance sheet, and I do think that we are on track."

*Wolfe, Sean, (May 31, 2018) "UBER's CEO says the company is 'on track' to go public by the end of next year — here's what needs to happen first.*

61.     In the second quarter of 2018, UBER's revenue increased 41% year over year (i.e., as compared with the second quarter of 2017), while losses narrowed 24% year over year, but widened 32% from the first quarter.  *Zaveri, Paayal, (August 15, 2018) "UBER's revenue and bookings growth slowed slightly in the second quarter of 2018, company reports."*

62.     On August 27, 2018, Toyota announced a partnership with UBER to bring an on-demand autonomous ride-hailing service to market.  The deal included a $500 million investment from Toyota in UBER.  *Somerville, Heather (August 27, 2018) "Toyota to invest $500 million in UBER for self-driving cars." Reuters.*

63.     Toyota's investment values UBER at about $72 billion.  *Bensinger, Greg and Dawson, Chester, (August 27, 2018) "Toyota Investing $500 Million in UBER in Driverless-Car Pact." Wall Street Journal*

64.     Whether UBER is valued at $62 billion or at $72 billion, the company has no financial excuse for failing to provide WAV service either by acquiring and deploying its own fleet of wheelchair accessible vehicles or by partnering with public or private entities that can reliably provide WAV service.

65.     The only reasonable explanation for UBER's failure to provide WAV service is that it decided, as a matter of corporate policy, to ignore the anti-discrimination laws and to conduct business in Massachusetts as if potential customers who require WAV service do not exist.

66.     In 2017, out of Massachusetts' population of nearly 7 million, nearly 8%, or

approximately 550,000 were persons under the age of 65 with a disability.  *United States Census Bureau, (July 1, 2017) Quick Facts Massachusetts*

67.    By any reasonable interpretation of that 2017 population statistic, UBER is failing to make its services available to a vast number of potential customers in Massachusetts.

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

68.    Despite having available resources, UBER has failed to take those steps necessary to ensure that residents of Massachusetts with disabilities are not excluded, denied transportation services, segregated or otherwise treated differently from all other individuals.

69.    Mr. Theodore and other potential UBER customers have suffered an injury in fact as a result of UBER's non-compliance with the ADA.  Mr. Theodore's desire and expectation use UBER in the future creates a real and immediate threat of future harm.

70.    UBER has failed to adopt adequate non-discrimination policies or has failed to modify its policies to accommodate disabled persons.

71.    UBER has denied persons with disabilities, such as Mr. Theodore and other similarly situated potential UBER customers, an opportunity to participate in or benefit from the services, facilities, privileges, advantages, or accommodations equal to those afforded to non-disabled customers of UBER.

72.    The actions and initiatives that UBER has failed to undertake in order to make its transportation network wheelchair accessible are actions and initiatives that would greatly assist disabled Massachusetts residents.

73.    UBER's conduct constitutes ongoing and continuous violations of the ADA and, unless restrained from doing so, UBER will continue to violate the ADA.  Said conduct,

unless enjoined, will continue to inflict injuries for which and Mr. Theodore and all persons similarly situated have no adequate remedy at law.

74.     Mr. Theodore and other similarly situated members of the class have been obligated to retain the undersigned counsel for the filing and prosecution of this action.

75.     Mr. Theodore and other similarly situated members of the class, are entitled to have their reasonable attorneys fees, costs and expenses paid by UBER pursuant to 42 USC § 12205.

76.     The injunctive relief requested herein will redress the injury sustained by AWS, by Mr. Theodore, and by others similarly situated.

**WHEREFORE**, the plaintiffs respectfully request that:

a.      This matter will be certified as a class action with the class defined as residents of Massachusetts who are not eligible users of The Ride, who require WAV service, and who desire to use and who would use UBER's transportation network and services but for UBER's failure to provide WAV service;

b.      The plaintiff, Dino Theodore, will be appointed class representative;

c.      The Court will enter a permanent injunction pursuant to 42 USC § 12188(a)(2) and 28 C.F.R. § 36.504 requiring UBER to provide on-demand WAV service throughout Massachusetts and to amend its policies and procedures vis-à-vis disabled customers in order to render UBER's transportation network and services readily accessible to and useable by individuals with disabilities on an equal basis with non-disabled persons to the extent required by the Americans with Disabilities Act and Subpart E of 28 C.F.R. Part 36; and

d.      The Court will award appropriate attorneys' fees and costs of this suit as provided by 42 USC §12205.

Respectfully submitted,
The Plaintiffs, DINO THEODORE, et al.,

By their Attorneys,

18

*/s/ Nicholas S. Guerrera*
Nicholas S. Guerrera, BBO No. 551475
Shaheen, Guerrera & O'Leary, LLC
Jefferson Office Park
820A Turnpike Street
North Andover, MA 01845
(978) 689-0800
Dated: 10/15/2018        nguerrera@sgolawoffice.com