```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


DINO N. THEODORE,              )
and                            )
ACCESS WITH SUCCESS, INC.,     )
          Plaintiffs,          )    CIVIL ACTION NO.
                               )    18-cv-12147-DPW
v.                             )
                               )
UBER TECHNOLOGIES, INC.,       )
                               )
          Defendant.           )
```

## MEMORANDUM AND ORDER
### March 3, 2020

Dino Theodore and Access with Success, Inc. bring this action seeking permanent injunctive relief barring an allegedly discriminatory practice by Uber Technologies, Inc. of not providing wheelchair accessible vehicles to all areas of the Commonwealth of Massachusetts, or at least those currently served by Uber.  In particular, Mr. Theodore and Access with Success contend in their now-operative second amended complaint that Uber's failure to provide wheelchair accessible vehicles in the suburb where Mr. Theodore resides, northwest of Boston near the border with New Hampshire, violates Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq*.

Uber has moved for an order to compel arbitration of all claims, under the Terms and Conditions to which Uber contends Mr. Theodore agreed when he created his account.  More specifically, Uber argues that, at a minimum, an arbitrator

should decide at the threshold the arbitrability of the claims set forth by Mr. Theodore and Access with Success under the delegation clause of the Terms and Conditions.

In opposition, Mr. Theodore and Access with Success contend that there was never any valid written agreement between Mr. Theodore and Uber through which the parties agreed to arbitrate the claims set forth in Plaintiffs' second amended complaint.

## I. BACKGROUND

### A. *Factual Background*

Mr. Theodore is a 58-year-old practicing attorney, who is paralyzed from the chest down; he lives in Dracut, Massachusetts. Due to his condition and other physical setbacks, he has begun to rely more heavily on a power wheelchair that does not allow him to use an automobile equipped with hand controls, which he otherwise could drive.

Access with Success is a non-profit corporation, whose "members are able-bodied individuals and qualified individuals with disabilities as defined by the ADA." Mr. Theodore serves as a member and a director of Access with Success, with whom he has filed at least 45 federal actions as a co-plaintiff.

In October 2016, the Massachusetts Bay Transportation Authority began working with Uber, as well as its competitor ride-share company, Lyft Inc., to introduce a pilot program to provide subsidized rides in wheelchair accessible vehicles for

disabled passengers in a specific region of the Commonwealth.[1] Dracut is outside the region served by the RIDE program, which is where Uber's pilot program operates; consequently, Uber allegedly has no wheelchair accessible vehicles available for Mr. Theodore to take from his home.

Massachusetts General Law c. 161A provides statutory authority for the MBTA, including the definition of its "area constituting the authority." M.G.L. c. 161A § 1 (the "area constituting the authority" of the MBTA is "the service area of the authority consisting of the 14 cities and towns, the 51 cities and towns, and other served communities," which are all defined terms under the statute). Dracut is included under the "other served communities" within the "area constituting the authority" of the MBTA, *id*., as well as the Lowell Regional

---

[1] The pilot program is designed to operate within the region that is served by the MBTA's para-transit service, "The RIDE," which provides transportation for people who have a disability that prevents them from using typical MBTA services such as buses, subways, or trolleys.
  To provide context for this Memorandum, I take notice that MBTA is of the view that, "[u]nder the ADA, paratransit functions as a safety net. It is not intended to be a comprehensive system of transportation, and it's different from medical or human services transportation." *See generally https://www.mbta.com/accessibility/the-ride* (last visited Mar. 3, 2020). The RIDE program is available in 58 cities and towns "in the greater Boston area…" *Id.* Dracut, Massachusetts is outside the RIDE Service Area. As of March 2017, the pilot program was expanded to "all eligible users of the RIDE." *See* https://www.mass.gov/news/governor-baker-mbta-celebrate-*expansion-of-the-rides-on-demand-paratransit-service* (last visited Mar. 3, 2020).

Transit Authority, under M.G.L. c. 161B § 2. "The area constituting the authority and the inhabitants thereof are … a body politic and corporate, and a political subdivision of the commonwealth, under the name of Massachusetts Bay Transportation Authority." M.G.L. c. 161A § 2. The MBTA's organic statute provides that "no person shall, on the grounds of… handicap, be denied participation in, or the benefits of, or be otherwise subjected to discrimination under any program or activity administered or operated by or for the authority." M.G.L. c. 161A § 5(a). Within the MBTA's statutory authority is the power to "conduct research… experimentation… and development, in cooperation with the [mass transit division within the] department [of transportation], and other governmental agencies and private organizations when appropriate, with regard to mass transportation … services." M.G.L. c. 161A § 3(l).

On October 4, 2016, Mr. Theodore created an account on Uber's website and downloaded the app to his smartphone. None of the options presented for his desired destination included a wheelchair accessible vehicle, and after doing more research, Mr. Theodore concluded that this service was not available and deleted the app from his phone. On July 12, 2018, after hearing about the availability of Uber wheelchair accessible vehicles, Mr. Theodore logged onto the website and began to "sign-up" again; however, he did not complete the process once he

4

determined that Uber's wheelchair accessible vehicles were not available to him in Dracut.

## B.    *Questions Presented*

Uber's motion to compel arbitration presents the need to make determinations regarding who will decide the applicability of the Terms and Conditions of the account agreement which Mr. Theodore created on October 4, 2016.[2]

These determinations will be applicable both to Mr. Theodore and Access with Success.[3]

---

[2] In this connection, I note at the outset my conclusion that Mr. Theodore did not effectively cancel his account by his collateral act of deleting the related app.  Indeed, the Terms and Conditions of that account agreement state that the dispute resolution section survives cancellation of a user's account.  Thus, I find the argument by Mr. Theodore and Access with Success that his deletion of the app had the effect of freeing Mr. Theodore from the Terms and Conditions of the account agreement to be unavailing.

[3] If Mr. Theodore is compelled to arbitrate, then so too is Access with Success because it is suing either as a membership organization, or as his alter ego.  Access with Success has served as an organizational co-plaintiff for Mr. Theodore on numerous occasions.  In fact, it has joined Mr. Theodore as a co-plaintiff in the last 45 federal lawsuits filed by Access with Success.  "Associations suing in a representative capacity are bound by the same limitations and obligations as their members . . ."  *Klay* v. *All Defendants,* 389 F.3d 1191, 2012-03 (11th Cir. 2004) (citing *Arizonans for Official English* v. *Arizona*, 520 U.S. 43, 65-66 (1997)).  Access with Success alleges it sues as a co-plaintiff here based on its "injury as a result of the defendant's actions or inactions . . . [and] because of its association with Dino Theodore and his claims . . ."  Accordingly, it is a co-plaintiff in its representative capacity and would be bound by enforced arbitration against Mr. Theodore.

Moreover, "where corporations are formed, or availed of, to carry out the objectives and purposes of the corporations or

5

## II. STANDARD OF REVIEW

A party seeking to compel arbitration "must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto-Fonalledas* v. *Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011).

Section 2 of the Federal Arbitration Act provides that an arbitration clause in a written contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress passed the FAA to put into place a "policy favoring arbitration." *AT&T Mobility, LLC* v. *Concepcion*, 563 U.S. 333, 339 (2011). Nevertheless, "the FAA does not require parties to arbitrate when they have not agreed to do so." *Cullinane* v. *Uber Techs., Inc.*, 893 F.3d 53, 60 (1st Cir. 2018) (quoting *Volt*

---

persons controlling them," agency principles may dictate that the controlling person(s) and the entity not be regarded as separate. *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 233 N.E.2d 748, 751 (Mass. 1968); *see also Iantosca* v. *Benistar Admin. Services, Inc.*, 567 Fed. Appx. 1, 7 (1st Cir. 2014) (citing *My Bread* as the "seminal Massachusetts case on disregarding the corporate form" and noting that it "does not suggest that making a 'sham' finding is a prerequisite" to do so)). Without prejudice to further factual development to test the proposition, I am presently of the view that the principles of *My Bread* appear to contemplate the circumstances here, given Mr. Theodore's office as a director of Access with Success.

6

*Info. Scis., Inc.* v. *Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989) (internal quotation marks omitted)).

### III. APPLICABILITY OF THE "TERMS AND CONDITIONS"

In answering whether or not the claims raised by Mr. Theodore and Access with Success should be resolved by arbitration, I first address the question "whether . . . there exists a written agreement to arbitrate." *Lenfest* v. *Verizon Enter. Solutions, LLC*, 52 F. Supp.3d 259, 262-63 (D. Mass. 2014). "The burden of making th[e] showing [that there is a written agreement to arbitrate] lies on the party seeking to compel arbitration." *Id.* (citing *Dialysis Access Ctr., LLC* v. *RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011)). Plainly there is such a written contract here. *See* note 2, *supra*. However, if such a written contract containing the arbitration agreement was never binding on the plaintiffs, its arbitration clause cannot be enforced against them.

When determining whether the parties agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts." *Cullinane*, 893 F.3d at 61 (citing *First Options of Chi., Inc.,* v. *Kaplan*, 514 U.S. 938 944 (1995)).

In Massachusetts, "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers *are essential* if electronic bargaining is to have integrity and credibility." *Id*. (emphasis

7

added) (citing *Ajemian* v. *Yahoo! Inc.*, 987 N.E.2d 604, 612 (Mass. App. Ct. 2013)).[4]  With that principle in mind, the Massachusetts Appeals Court in *Ajemian* has outlined a two-step inquiry, endorsed and applied by the First Circuit in *Cullinane*, to determine enforceability of clauses[5] in online agreements. *Id.* at 62.  Consequently, here I must first determine whether the contract terms were "reasonably communicated to the plaintiffs."  *Ajemian*, 987 N.E.2d at 612.  Second, I must determine whether "the record shows that those terms were 'accepted and, if so, the manner of acceptance.'" *Cullinane*, 893 F.3d at 62 (citing *Ajemian*, 987 N.E. 2d at 613)).

### A. *Reasonable Communication to Mr. Theodore*

As in *Cullinane*, Uber here does not argue that Mr. Theodore read the Terms and Conditions containing the arbitration clause, rather Uber "relies solely on a claim that its online presentation was sufficiently conspicuous as to bind the

---

[4] In its most recent discussion of the applicable principles for requisite notice in online contracts of adhesion, the First Circuit in *Cullinane* v. *Uber Techs., Inc.*, 893 F.3d 53, 61-62 (1st Cir. 2018) expressly looked to *Ajemian* v. *Yahoo! Inc.*, 987 N.E.2d 604, 611-15 (Mass. App. Ct. 2013) as a decision containing "trustworthy data for ascertaining [Massachusetts] state law" on this issue.

[5] The clause in question in *Ajemian* was a forum selection clause; however, nothing about the two-step inquiry is specific to that particular kind of clause.  The same form of inquiry can guide determination of the enforceability of an arbitration clause.  I will deploy it to do so here as the First Circuit did in *Cullinane*.

8

Plaintiffs whether or not they chose to click through the relevant terms." *Id.* In the "context of web-based contracts . . . clarity and conspicuousness are a function of the design and content of the relevant interface." *Id.* (citing *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

Under the provisions of the Massachusetts Uniform Commercial Code, "conspicuous" is defined as "written, displayed or presented [such] that a reasonable person against which it is to operate ought to have noticed it." M.G.L. c. 106 § 1-201(b)(10); *cf.* M.G.L. c. 156D § 1.40 (under the general law of corporations established by the Massachusetts Business Corporation Act, a reasonable person standard is applied to whether someone "should have noticed it").

Characteristics that should generally be considered when determining whether terms are sufficiently conspicuous include: "larger and contrasting font, the use of headings in capitals, or somehow setting off the term from the surrounding text by the use of symbols or other marks." *Cullinane*, 893 F.3d at 62 (citing M.G.L. c. 106 § 1-201(b)(10)). There are additional considerations "when the terms of the agreement are only available by following a link." *Id.* Under those circumstances, "the court must examine the language that was used to notify users that the terms of their arrangement could be found by following the link, how prominently displayed the link was, and

any other information that would bear on the reasonableness of communicating [the terms]." *Id.* (citing *Ajemian*, 987 N.E.2d at 612).

In *Cullinane*, inquiry stopped after the First Circuit concluded that Uber did not reasonably communicate the terms of their agreement with Plaintiffs. *Id.* at 64. As a result, the First Circuit determined Plaintiffs were not able to provide unambiguous assent and therefore were not bound by the arbitration clause. *Id.*

The screen that a new user sees when he or she is signing up for the Uber account at issue here is somewhat different from that at issue in *Cullinane*. I am consequently faced with the question whether the difference is enough to change the outcome reached by the First Circuit in *Cullinane*.[6]

---

[6] On January 29, 2020, *Cullinane* was resolved on remand when I approved a settlement agreement between the parties. *See Cullinane* v. *Uber Technologies, Inc.*, No. 14-cv-14750-DPW, Dkt No. 130 (D. Mass. Jan. 29, 2020). The case was settled for a nominal $3 million amount, to be paid to Massachusetts residents (defined as persons who both registered for an Uber account via an iPhone in Massachusetts and had a Massachusetts billing address) who paid at least one of either the allegedly unlawful "Logan Massport Surcharge and Toll" and/or "East Boston Toll," between October 18, 2011 and August 14, 2015 and did not receive a refund for those charges. The payments are to be distributed in one of two ways: (1) class members with active Uber accounts will receive their payment in the form of a credit on their Uber accounts (a "customer loyalty" allocation), and (2) class members without active Uber accounts (or who do not use their app credits within 365 days of receipt) will receive their payment in the form of a mailed check (a "cash payment" allocation).

In *Cullinane*, a new user was not required to click the "Terms and Conditions" link in order to proceed to the next step of creating an account, even though that was the point at which the new user would be bound to those Terms and Conditions. The link to the Terms and Conditions (and the Privacy Policy) was located in a gray rectangular box, written in white text. Other terms on the page had similar features, such that the hyperlink was not accentuated by comparison. *Id.* at 63. For example, "'enter promo code' w[as] also written in bold and with a similarly sized font as the hyperlink . . ." *Id.* The text of the "Terms and Conditions" link was not the largest font on the page. *Id.* Finally, the text used to put potential users on notice "that the creation of an Uber account would bind them to the linked terms was even less conspicuous than the" hyperlink to the "Terms and Conditions" themselves. *Id.*



**Screenshot from *Cullinane* above**



**Screenshot from *Theodore* above**

The only noteworthy differences between the features that relate to notice of the arbitration clause at issue here and those at issue in *Cullinane* are that (1) the links to the "Terms

12

and Conditions" and "Privacy Policy" here appear in blue text against a white backdrop, whereas in *Cullinane*, those links were in white text against a black backdrop (as indicated by the wide, horizontal arrows at the bottom of the boxes shown above), and (2) the notification to new users that they would be bound by the "Terms and Conditions" (including arbitration) and "Privacy Policy" when they created their account here is in black text against a white backdrop, whereas in *Cullinane*, it was in gray text against a white backdrop (again, as indicated by the narrow, diagonal arrows in the boxes shown above).

Apart from those two differences, the relevant features present in *Cullinane*, as analyzed by the First Circuit, were operative at the time Mr. Theodore created his account. For example, some of the other terms on the page were still in the same color as the hyperlink, including "enter promo code," and the links to the "Terms and Conditions" and "Privacy Policy" were still not the largest text on the screen. The hyperlinks also continued to appear without any underlining. Finally, as before, the Terms and Conditions were linked at the bottom of the screen and did not require an affirmative acknowledgment[7]

---

[7] For this reason, in my decision in *Cullinane*, I adopted Judge Weinstein's shorthand phrase "sign-in-wrap" to describe the online agreement, through which "a user is notified of the existence and applicability of a site's "terms of use" when proceeding through the website's sign-in or login process," but does "not require the user to click on a box showing acceptance…

from the prospective user that he or she was agreeing to be bound by the Terms and Conditions or the Privacy Policy by creating an Uber account.

In *Cullinane*, the First Circuit grounded its determination that Plaintiffs lacked sufficient notice of the agreement based on the characteristics of the hyperlink itself and how it compared to other text on the screen. The Court observed that hyperlinks were generally blue and underlined, and "the presence of other terms on the same screen with similar or larger size, typeface…" did not render the agreement sufficiently conspicuous. While the Terms and Conditions in the agreement now before me appear in blue, but without underlining, the other characteristics that gave the First Circuit pause generally were found on the relevant Uber screen for Mr. Theodore.

The First Circuit has had one occasion to reflect further on the propositions for which *Cullinane* stands since it was decided in 2018. In *Bekele* v. *Lyft*, the court observed that *Cullinane* did not "substantially change" the applicable law and that the procedure for analyzing online contracts was and still is the *Ajemian* standard of "reasonably communicated and accepted." 918 F. 3d 181, 187 (1st Cir. 2019). The First

---

in order to continue." *Berkson* v. *Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015); *see also Cullinane*, 893 F.3d at 61 n. 10 (adopting Judge Weinstein's "four general types of online contracts").

14

Circuit also took the position that the importance of analyzing reasonable notice *in context* was clear before *Cullinane*. *Id.*

In the meantime, the First Circuit's decision in *Cullinane* has received the attention of some legal scholars. It appears that *Cullinane* has been recognized as a paradigm of judicial reliance on analysis of the general context in answering questions regarding reasonable notice to consumers in online contracts of adhesion; but there appears to be little consideration in the academic literature of *Cullinane*'s more particularized contextual requirements as a basis to satisfy adequate notice. *See, e.g.*, Nancy Kim, *Digital Contracts*, 75 Bus. Law. 1683, 1692 (Winter 2019-20) (noting the First Circuit's emphasis on the "design and content" of the screen in question); Kevin Conroy & John Shope*, Look Before You Click: The Enforceability of Website and Smartphone App Terms and Conditions*, 63 Bos. Bar. J. 23, 23-24 (Spring 2019) (observing the "complicated and fact-intensive" inquiry associated with 'sign-in-wrap' agreements and *Cullinane*'s finding of inadequate notice based on the interface design); Mark Budnitz, *Touching, Tapping, and Talking: The Formation of Contracts in Cyberspace* 43 Nova L. Rev. 235, 277 n. 414-15 (Spring 2019) ("Even if there were more than a few appellate-level cases, it is questionable whether they could provide helpful guidance for legislators. Courts decide issues concerning contract formation based on a detailed

15

examination of the content and format of the specific screens presented to the consumer in the case before the court.") The First Circuit's specific directives on how courts in this Circuit are to address these inquiries and what specific circumstances should be emphasized are, in any event, binding upon me when addressing reasonable notice for sign-in-wrap agreements.

*Cullinane* plainly provided both high level contextual analysis and micro-analysis of particular elements of that context. *Cullinane* as a whole has been characterized negatively by Judge Gutierrez, of the Central District of California. *West v. Uber Techs.*, No. CV 18-3001 PSG (GJSx), 2018 WL 5848903, at *4 (C.D. Cal. Sept. 5, 2018; *see also In re. Uber Techs., Data Security Breach Litig. Brittany Durgin* v. *Rasier, LLC*, No. CV 18-3169 PSG (GJSx), 2019 WL 6317770 at *4 (C.D. Cal. Aug. 19, 2019). With respect, I find Judge Gutierrez's view that "the *Cullinane* decision departs dramatically both from what other courts have found regarding Uber's registration process, and from the overall legal landscape regarding assent to online agreements" to be overstated. This overstatement appears to result from a failure to distinguish between the high level contextual analysis and the micro-analysis of particularized elements of the context. Nevertheless, in *Rasier*, 2019 WL 6317770 at *4, Judge Gutierrez adopted the *Meyer* approach, which

16

was also expressly relied upon by *Cullinane*. *Cullinane*, 893 F.3d at 62, *supra* at 8 (citing *Meyer*).

In *Meyer*, the Second Circuit reversed and remanded the district court's denial of Uber's motion to compel arbitration, finding that a reasonably prudent smartphone user would understand the process of entering into contracts through smartphones apps. *Id*. at 77-79. The *Meyer* court specifically said that these users would recognize that "text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Meyer*, 868 F.3d at 78. This approach essentially mirrors the First Circuit's focus in *Cullinane*. *See also*, Conroy at 23 ("This two-part test [from *Ajemian* and employed by the First Circuit in *Cullinane*] is consistent with the approach taken by other courts in the country. *E.g.*, *Meyer*…"). Indeed, the screen from *Meyer* appears to resemble the screen here closely. *See generally Meyer*, 868 F.3d at 81-82. Based on the guidance I have received from the First Circuit in *Cullinane*, I conclude the Terms and Conditions on the screen seen by Mr. Theodore when he created his Uber account were not conspicuous enough reasonably to communicate the existence or terms of the agreement. Therefore, Mr. Theodore cannot be bound by the mandatory arbitration provision.

**B.** *Acceptance by Mr. Theodore*

As a result of the want of legally sufficient notice to Mr. Theodore that under First Circuit law he was agreeing to be bound by the hyperlinked Terms and Conditions, which contained the mandatory arbitration clause at issue here, he could not have provided his "unambiguous consent to those terms." *Cullinane*, 893 F.3d at 64. Accordingly, Uber has not met its burden to justify compelling arbitration, and, under *Cullinane*, I must deny its motion seeking that relief because parties may not be compelled to arbitrate when they have not agreed to do so. *See*, *supra*, *Cullinane*, 893 F.3d at 60 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)).

## IV. CONCLUSION

For the reasons outlined above,

I DENY Uber's Motion [Dkt No. 20] to compel arbitration. This case will follow the ordinary course of civil litigation in this court. The Clerk shall set the matter for a scheduling conference to chart the course toward resolution of this case.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE